UNITED STATES, Respondent, *v.* JOHN H. MILES, Appellant.

1. Religious Belief in Criminal Cases.—Where a defendant is on trial for the crime of polygamy, a juror who belongs to the Mormon Church, and believes that polygamy is a direct command from God, and is thus above the laws of man, should be excluded from sitting as a juror in the case.

2. Religious Belief in Criminal Cases.—Such religious belief shows the existence of a state of mind on the part of the juror which leads to a just inference that he will not act with entire impartiality.

3. Judgment of Triers.—Under our Criminal Code, the decision of triers appointed by the court on a challenge for actual bias, is final.

4. Variance as to Name of Second Wife.—Where defendant is indicted for bigamy, and the second marriage is alleged to have been with Caroline Owens, but the proof showed a marriage with Caroline Owen Male. *Held*, Not a material variance.

5. Accomplice in Bigamy.—In bigamy or polygamy there is no such thing as an accomplice, and the defendant can be convicted on the testimony of the alleged second wife alone.

6. Marriage in the Mormon Endowment House.—Evidence is admissible in a prosecution for polygamy, that the person with whom the alleged polygamous marriage is said to have taken place, was in the Endowment House, where such marriages are solemnized, on a certain day, and had on the dress peculiar to those who go there to contract such marriages.

7. Proof of First Marriage.—The existence of a prior marriage may be shown by evidence of facts from which it may be inferred.

8. Proof of First Marriage — Admissions of Defendant.—The deliberate admissions of the defendant are of themselves sufficient, in a bigamy case, to establish the first marriage.

9. Testimony of Alleged Bigamous Wife.—The alleged second wife can be admitted to testify as to the second marriage, notwithstanding the first or prior marriage of defendant with another woman, has been shown only by the admissions of the defendant.

Appeal from the Third Judicial District Court.

When the jury was called in the case, those who belonged to and were members of the Mormon Church, were asked if

they believed in the doctrine of polygamy, and they answered
that they did, but that they would agree to enforce the law
against it.   That they believed that polygamy came from God,
and that God's law was the higher law.   Whereupon they
were severally excluded from the jury by triers appointed by
the court.   The court was asked to instruct the jury that Car-
oline Owen, the person with whom the second marriage was
alleged to have taken place, was an accomplice, and that her
testimony should be corroborated before the jury could con-
vict, which the court refused to do.   Defendant excepted.

The other fact appears in the opinion of the court.

*Tilford & Hagan* and *Dusenberry*, for appellant.

It is a well settled principle of law that the second wife
cannot be admitted to testify until the first marriage is *clearly
proved*.   As long as the first marriage is a contested fact, the
second wife is incompetent as a witness.   3 Greenl. § 206; 1
Greenl. § 339; 1 Philips, 84; Roscoe Cr.' Ev. 150–311.

This proposition being conceded, brings us, secondly, to
the inquiry, what is sufficient proof in law to establish the
first marriage?   The discussion of this inquiry leads logically
to a review of the language of the United States statutes,
creating the offense of bigamy in the Territories, and a com-
parison of it with the English statute on the same subject.
2 Bacon's Abridgt. 108; Revised Statutes, 11, § 4; 4 Burrows,
2057; 2 Arch. 1816; *People* v. *Humphrey*, 7 John. 314;
*Commonwealth* v. *Littlejohn*, 15 Mass. 162; *State* v. *Mink-
ley*, 14 N. H. 494, 495; *State* v. *Roswell*, 6 Conn. 446; 1
Parker, 378; *Case* v. *Case*, 17 Cal. 598; *People* v. *Lambert*,
5 Mich. 350–365; 24 How. 605.

*Commonwealth* v. *Jackson*, 11 Bush., considered, holds
that one charged with bigamy can be convicted on his declara-
tions when such declarations are coupled with evidence of co-
habitation.   *Jackson* v. *People*, 2 Same, referred to and
explained; 2 Arch. 1808.

Admissions of defendant inadmissible and incompetent

evidence at any stage of the examination. See Poland Bill as originally passed by the House and as amended in Senate. S. B. 30; 15 Mass. 162; 6 Conn. 446–451; 5 Mich. 349–367.

Admissions of defendant not sufficient to convict without proof of actual marriage, *aliunde.* Nor is reputation, cohabitation and admissions, sufficient without proof of marriage in fact. *People* v. *Gohagan*, 1 Parker's Cr. 378; *People* v. *Humphrey*, 7 John. 314; (In this case confession deliberately made before magistrate;) 13 Wis. 162; *Commonwealth* v. *Littlejohn and Margaret Barberick.* There was also proved cohabitation, etc.— strong case. *State* v. *Roswell*, 6 Conn. 446–451.

Cohabitation for more than thirty years, and reputation, evidence held inadmissible. *State* v. *Minkley*, 14 N. H. 495; *People* v. *Lambert*, 5 Mich. 349, 350, 365–367; *Morris* v. *Miller*, 4 Burrows, 2057; 2 Arch. 1816; 24 How. (U. S.) 605.

Admissions of defendant not admissible under any law or condition of the case until *corpus delicti* established *aliunde.* Bishop's Stat. Crimes, § 608, 609; 1 Greenl. § 217.

An entry in a registry of marriage, not competent evidence without proof that such register was required to be kept by law. 2 Green Cr. 492; 1 Greenl. 493.

First wife cannot testify. Second wife not permitted to testify until first marriage has been proved. 1 Philips, 84; 3 Greenl. 206; Roscoe Cr. Ev. 150–311.

Carrie Owen was an accomplice, and her testimony should have been corroborated.

It was error to exclude the jurors on the grounds of religious belief.

*P. T. Van Zile*, for the people.

No brief on file.

BOREMAN, Justice, delivered the opinion of the court:

The appellant was indicted and convicted of the crime of bigamy, and from the judgment in this respect he has appealed to this court.

The first assignment of error was that "the court erred in allowing the attorney for the United States to ask the jurors or any of them if they believed in polygamy, or that he or they belonged to the Mormon Church, or allowing any question as to the religious belief of any juror."

The "criminal procedure" act says that a particular cause of challenge is "for the existence of a state of mind on the part of the juror, which leads to a just inference, in reference to the case, that he will not act with entire impartiality, which is known in this act as actual bias." § 241, 2nd clause, laws of Utah, 1878, p. 111.

A religious belief takes strong hold upon the individual. If a person believes it is his religious dury or privilege to do an act, he would not, as a consequence, look upon such act as criminal. Looking upon the act as innocent, he would naturally, but perhaps unconsciously, be averse to inflicting punishment therefor. He would not like to find a man guilty of a crime for doing that which he thought the Almighty authorized him to do. In such a case he would naturally lean toward an acquittal, and would possess that state of mind which would lead to a just inference that he would not act with entire impartiality in the case.

The inquiry as to whether the person offered as juror was a member of the Mormon Church, was of the same character as that respecting his belief; both questions go to the belief. It is one of the leading doctrines of the Mormon Church that polygamy is divinely appointed; that it is ordained of God, and to be revered as such. It is likewise one of the cardinal teachings of the church that as it is God's law it is above man's law, and that when the practice comes in conflict with the laws of the land, the law of the church must be obeyed, and the law of the land disobeyed. One belonging to a church holding the offense charged to be of divine sanction and above the civil law, might also be influenced by the probable action of his church toward him if he failed in the jury box as well as elsewhere to uphold its doctrine.

United States v. John H. Miles.

But all of the jurors to whom these questions were asked, and who were excluded, were in the first place challenged for actual bias, and the challenge submitted to triers appointed by the court. Those triers in each instance found the challenge true, and their decision was final. These questions, therefore, were not material nor important. The court and the parties were bound by the decision of the triers, for the statute says. that if the triers find the challenge true, " the juror must be excluded." Cr. Pr. § 253; Laws of Utah, 1878, p. 113.

It is claimed, however, that the court had no authority for appointing triers. In the selection of jurors the Territorial statutes are to control the courts when there is no conflict with the United States statute. *United States* v. *Reynolds*, U. S. Supreme Court, but not yet reported; *Clinton* v. *Englebrecht*, 13 Wall. 434.

Our Territorial statute, the criminal procedure act of 1878, requires the court to appoint triers, when the challenge is for actual bias and the challenge is denied, (Laws of Utah, 1878, pp. 112–3.) We do not, therefore, see that there was any error committed by the court in appointing the triers.

The indictment charges the second marriage to have taken place between appellant and Caroline Owens, but it is alleged that her name is Caroline Owen Maile or Caroline Owen. The name of this party, after her adoption by her uncle, was that of Caroline Owen, and such was the name that she was known by, and she was not afterwards known by the name of Maile. The offense is sufficiently described. There is no evidence or claim that the appellant was mislead as to the person intended, especially when, in the appellant's brief, it is stated that " the alleged second marriage " is admitted. This is not the case of a mistake in the defendant's name, but if it were, the description would have been sufficient and the variance immaterial. The name of Owen and Owens have the same sound. *State* v. *Havely*, 21 Mo.

It is claimed that Caroline Owen, being a party to the second marriage, was an accomplice, and that the court should have

instructed the jury not to convict on her testimony, unless corroborated by other witnesses. Under the United States statute against bigamy or polygamy, there is no such thing as an accomplice; it is unknown to the law.

Philips says that an accomplice "in all cases expects to earn a pardon," and hence such testimony needs to be corroborated; "the temptation to commit perjury being so great where the witness, by accusing another, may excuse himself." Phil. Ev. pp. 37, 41.

The reason of the rule failing, then the rule itself fails. In the instance before us no such temptation could influence the witness, nor could any hope of pardon. She had committed no offense, and could not commit the offense charged against the defendant.

The allowing of questions to be put to witness, D. H. Wells, respecting the dress or robes of the persons visiting the endowment house, is assigned for error.

All marriages in the endowment house, as shown by the testimony, are clandestine and performed under cover of sworn secrecy. Direct testimony is therefore extremely difficult of access, and hence every fact going to show the object of the party's visit becomes material. If it were necessary that a peculiar style of dress be worn in case of marriage, it was proper to show what that style was. If the party were dressed according to the requirements in case of marriage, the presumption would be that she was there for that purpose. If she were not dressed in the mode required, the presumption would be that she was not there for the purpose of marriage. With this view the question was certainly proper.

It is said that the first marriage was the *corpus delicti*, and must be clearly proven before confessions or admissions of the defendant can be admitted in evidence. Such a rule cannot apply to bigamy or polygamy cases, but only to those where the deed—the *corpus delicti*—is one thing, and the fact as to who did the deed is another. In bigamy or polygamy cases these two facts are not separate and distinct but one and the

same. The crime was not committed at all if defendant did not commit it. It requires his participation to constitute and complete the offense.

It is, however, strenuously contended that the declarations, confessions or admissions of the prisoner are not alone sufficient proof of the first marriage. If the surroundings of such admissions show them to have been deliberate, they would be sufficient to support a verdict of guilty. Greenleaf says that " marriage may be proved by the deliberate admissions of the prisoner." (3 Gr. Ev. § 204.) We are entirely without statute upon the subject of marriage, and the manner of its celebration and the proof thereof are left as at common law. As no special ceremony is required at common law, no proof is required to show whether any was performed or not. The only questions to be determined in this respect were whether the defendant and Emily Spencer were ever married, and if so, was that marriage prior to that between defendant and Carrie Owens. The existence of such prior marriage may be shown " by evidence of facts from which it may be inferred." 1 Bov. Inst. 263; Bishop's St. Crimes, § 609; 1 Bishop's M. & D. §§ 260, 266.

That the prisoner's deliberate admissions are facts from which the marriage may be inferred is, as we believe, well established, and supported by the later English as well as American authorities, and the rule does not seem either unreasonable or unjust, but eminently proper and right. 1 Bishop's M. & D. §§ 497, 500; Wharton's Am. Crim. Law, §§ 26, 31; 1 Philip on Ev. (side page) 452, 542; 2 Gr. Ev. § 461, note 1; 2 Starkie's Ev. (6 Am. ed.) 251-2 " C."; 1 Russell on Crime, 218, notes; Murtagh's case, 1 Ashmead, 272; *Forney* v. *Hallachen*, 8 S. & R. 159; Warner's case, 2 Va. cases, 95; *Com.* v. *O'Neil*, 17 Grattan, 582; Britter's case, 4 McCord, (S. Car.) 256; Hilloin's case, 3 Rich. 434; *Regina* v. *Sommonsto*, 47 E. C. L. 164; *Wolverton* v. *State*, 16 Ohio, 173; Cayford's case, 7 Greenleaf, (Me.) 57; Harris' case, 11 Me. 301; *State* v. *Hodgskins*, 19 Me. 155; *Jackson* v.

*People*, 2 Scam. 231; *Quin* v. *State*, 46 Ind. 725; *State* v. *Seals*, 16 Ind. 352; *Arnold* v. *State*, 53 Ga. 574; *Brown* v. *State*, 52 Ala. 338; *Langhtry* v. *State*, 30 Ala. 536; *Com.* v. *Jackson*, 11 Bush. (Ky.) 679; *Williams* v. *State*, 54 Ala. 131.

The defendant on numerous occasions deliberately admitted and declared that Emily Spencer was his wife. He introduced her (Emily) to various persons as "his wife." He said of her, "she is my wife," and also, "you are my wife." On the same evening, at Angus Cannon's, he spoke of her again as his "first wife," saying "that he was not going to put his first wife out of the house the first night they were married," etc. He also said that "if he could not dance with his wife Emily, he would not dance with any one." Going back a little, we find that immediately after coming out of the Endowment House, on the occasion of the marriage of himself and Carrie Owen, defendant declared to Carrie Owen that the marriage between himself and Emily had already taken place. When he came to the room of Carrie late at night, evidently from the room of Emily, his language indicated the same thing. He afterwards said to Carrie Owen, "I have never admitted to you before that Emily Spencer is my first wife, you are my second. * * * But there is no witness about to hear what I am telling you." He repeatedly spoke to her of Emily as his first wife. These samples of defendant's admissions of the first marriage, taken with the surroundings, show that they were not idle remarks, but deliberate statements of a fact.

In the case at bar, the verdict of the jury, however, does not depend alone upon the admissions, confessions or declarations made by the defendant, but said admissions and declarations are corroborated by a variety of circumstances. For example: Prior to the marriage with Emily Spencer, the defendant's conduct showed that such marriage was long contemplated, and that, too, as a first marriage. The defendant, and Emily Spencer, Carrie Owen, and Julia Spencer, called upon John Taylor, the head of the so-called "Church of Jesus Christ of

Latter Day Saints," to take the counsel of the head of their Church as to the precedence of these three girls if they should marry the defendant. Taylor was the highest authority in the Church, and his decision was final and conclusive, as the parties believed. He told them that the order was that the oldest must be the first wife—that the precedence was controlled by the relative ages of the girls, and that Emily Spencer, being oldest, must be the first wife if they married, and Carrie Owens should be the second wife. Defendant said that he must obey counsel and marry Emily Spencer as his first wife. This was in accordance with the desires of the defendant throughout, although he feigned otherwise to Carrie Owens in respect thereto.

The priority or precedence of Emily Spencer over Carrie Owens was talked of in the presence of the defendant, as appears by Katie Connelly's testimony. It was settled and well understood between the parties before they went to the Endowment House, that Emily Spencer was to be the first wife and Carrie Owens was to be the second.

The day that Emily was seen in the Endowment House was the day agreed upon for her marriage, as well as that of Carrie Owens.

The defendant persisted in taking Emily Spencer to the reception party at Angus Cannon's, notwithstanding the protests of Carrie Owens. He claimed that she (Emily) was his wife, and he would take her there. Whilst at the reception he treated Emily as his wife, recognizing her as such, taking her part as against Carrie Owens, and reproving Carrie Owens for her course towards Emily, when Carrie's whole conduct was prompted wholly by the very fact of his claiming Emily, instead of herself, to be his first wife.

He led Emily and Carrie to the marriage supper that evening, and otherwise acted toward Emily as his wife.

The place of marriage—of all marriages according to the requirements of the Mormon Church—is the Endowment House. Persons go there for two purposes, to-wit, to take

their endowments and to be married. It was necessary that the endowments be taken before marriage. In taking their endowments and in being married a peculiar set of garments or dresses was necessary. Emily Spencer had taken her endowments prior to that time in a similar house at St. George. She would, therefore, not go to the Endowment House in Salt Lake City to take her endowments. She was, however, seen there dressed in this peculiar manner required of parties taking endowments or getting married, and as she could not have been there for the purpose of taking her endowments, the conclusion, in connection with other circumstances, would seem to be inevitable that she was there for the purpose of marriage. She could have been there for no other purpose.

Emily Spencer and defendant were not married on that day, after his marriage with Carrie Owens, for he remained with Miss Owens whilst there, and went from the Endowment House with her.

Whilst defendant and Carrie Owens were in the Endowment House and about to be married, D. H. Wells, the party officiating, called defendant's attention to the fact that it was the first wife's privilege to give this woman (Miss Owens) to him, and that he, defendant, knew it. Wells' knowledge of the defendant's prior to marriage thus made manifest, did not call from defendant any denial of that marriage, but in effect he admitted it. As Carrie Owens arose to retire, thus showing a disposition to revolt, the defendant simply remarked to Wells, "Never mind," and the first wife was not called, although in the building, and the ceremony of marriage between defendant and Carrie Owens proceeded.

After defendant's arrest, but before indictment, he promised to give up the other woman and make Miss Owens his first and only wife, if she would come back to him.

These are some of the facts which corroborate the testimony as to defendant's admissions of the first marriage, and they together with the circumstances immediately surrounding

each admission, seem fully to sustain the truthfulness of such admissions.

The point raised, that the second wife cannot be admitted to testify until the first marriage is clearly proven, cannot possibly have any effect in this case; for here the admissions and corroborating circumstances showed clearly the first marriage before the second wife was offered as a witness, the subsequent testimony of Miss Owens, however, confirming them.

The admissions of the first marriage, with corroborating circumstances, ought to be sufficient in Utah, if anywhere, for here there is no statute upon marriage, and to cover up this crime of polygamy, every possible precaution is taken to prevent any proof of such marriages, and direct proof is nearly, if not entirely, impossible. Whatever of ceremony there is, takes place in secret, and such secrecy is enjoined by oaths of great affected solemnity. Such oaths, although illegal and void, are generally, by those taking them, treated as binding either from a mistaken notion of their validity or from a fear of the consequences to themselves of a violation thereof. The public demonstrations and the general condition of society here, show the praise that is awarded to such as shrink from their duty to uphold and obey the law and divulge these secrets, and such things also point unerringly to the ignominy and ostracism which the friends of this crime of polygamy seek to visit upon those who are honorable enough and brave enough to expose those hidden criminalities.

Concealment of the marriage contract is contrary to public policy and injurious to the best interests of society. Publicity affords protection. *Cunningham* v. *Brodell*, 4 Bradf. 343, 454, 455; 1 Bishop's M. & D., §§ 488, 539.

The object of such secrecy, no doubt, is to render the law against polygamous marriages a virtual nullity by making its execution an impossibility. It is the duty of courts not to uphold any such shield for crime, but to render it wholly unavailing. Polygamy is no more sacred than any other crime

and other crimes are daily in courts of justice established by circumstantial evidence and admissions.

We, therefore, see no error in the verdict and judgment of the court below, and the judgment is therefore affirmed.

We see no error in the instructions granted, nor do we see that the court below erred in rejecting those of defendant which were refused, as the law was laid down correctly in the instructions given.

SCHAEFFER, C. J., and EMERSON, J., concurred.

NOTE.—The foregoing case is now on appeal to the Supreme Court of the United States. *Reporter.*